# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

LISA D. WHYTE,

                Plaintiff,

      v.                            Case No. 18-CV-1274

ANDREW M. SAUL,

                Defendant.

---

# DECISION AND ORDER

---

## PROCEDURAL HISTORY

Plaintiff Lisa Whyte alleges she has been disabled since March 18, 2014, due to multiple sclerosis (MS), optic neuritis, depression, and vision problems. (Tr. 84, 125.) In April 2014 she applied for disability insurance benefits. (Tr. 230-31.) After her application was denied initially (Tr. 125-28) and upon reconsideration (Tr. 129-33), hearings were held before an administrative law judge (ALJ) on January 18, 2017 (Tr. 77-124), and June 21, 2017 (Tr. 32-76). On September 13, 2017, the ALJ issued a written decision, concluding Whyte was not disabled. (Tr. 13-25.) The Appeals Council denied Fitzgerald's request for review on June 18, 2018. (Tr. 1-3.) This action followed. All parties have consented to the

full jurisdiction of a magistrate judge (ECF Nos. 19, 20) and the matter is now ready for resolution.

## ALJ'S DECISION

In determining whether a person is disabled an ALJ applies a five-step sequential evaluation process. At step one, the ALJ determines whether the claimant has engaged in substantial gainful activity. The ALJ found that Fitzgerald "has not engaged in substantial gainful activity since March 18, 2014, the amended alleged onset date." (Tr. 16.)

The analysis then proceeds to the second step, which is a consideration of whether the claimant has a medically determinable impairment or combination of impairments that is "severe." 20 C.F.R. § 404.1520(c). "In order for an impairment to be considered severe at this step of the process, the impairment must significantly limit an individual's ability to perform basic work activities." *Moore v. Colvin*, 743 F.3d 118, 1121 (7th Cir. 2014). The ALJ concluded that Whyte "has the following severe impairments: multiple sclerosis (MS) and depression." (Tr. 16.)

At step three, the ALJ is to determine whether the claimant's impairment or combination of impairments is of a severity to meet or medically equal the criteria of the impairments listed in 20 C.F.R. Part 4, Subpart P, Appendix 1 (20 C.F.R. § 404.1520(d)) (called "The Listings"). If the impairment or impairments meets or medically equals the criteria of a listing and meets the twelve-month duration requirement, 20 C.F.R.

§ 404.1509, the claimant is disabled. If the claimant's impairment or impairments is not of a severity to meet or medically equal the criteria set forth in a listing, the analysis proceeds to the next step. The ALJ found that Whyte "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments." (Tr. 16.)

Between steps three and four, the ALJ must determine the claimant's residual functional capacity (RFC), which is the claimant's ability to perform both physical and mental work-related activities on a regular and continuing basis despite her impairments. *Moore*, 743 F.3d at 1121. In making the RFC finding, the ALJ must consider all of the claimant's impairments, including impairments that are not severe. 20 C.F.R. § 404.1529; SSR 96-4p. In other words, the RFC determination is a "function by function" assessment of the claimant's maximum work capability. *Elder v. Asture*, 529 F.3d 408, 412 (7th Cir. 2008). The ALJ concluded that Whyte has the RFC

> to perform light work, . . . except she must be allowed to alternate between sitting and standing at will as long as she is not off task for greater than ten percent of the workday. She also is limited to frequent use of foot controls bilaterally, kneeling, crouching, crawling, stooping, or pushing and pulling, reaching, overhead reaching, handling, fingering, and feeling with the right upper extremity; occasional balancing, climbing of ramps and stairs, operating of a motor vehicle, or pushing and pulling, reaching, overhead reaching, handling, fingering, and feeling with the left upper extremity; no climbing of ladders, ropes and scaffolds; and must avoid concentrated exposure to excessive noise and avoid all exposure to dangerous moving machinery and at unprotected heights. Additionally, she is limited to understanding, remembering, and carrying out simple instructions.

(Tr. 18.)

After determining the claimant's RFC, the ALJ at step four must determine whether the claimant has the RFC to perform the requirements of her past relevant work. 20 C.F.R. § 404.1526. The ALJ concluded that Whyte has no past relevant work. (Tr. 23.)

The last step of the sequential evaluation process requires the ALJ to determine whether the claimant is able to do any other work, considering her age, education, work experience, and RFC. At this step, the ALJ concluded that, considering Whyte's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that Whyte can perform. (Tr. 23.) In reaching that conclusion, the ALJ relied on testimony from a vocational expert (VE) who testified that a hypothetical individual of Fitzgerald's age, education, work experience, and RFC could perform the requirements of an electrical accessories assembler and bagger. (Tr. 23-25.) After finding that she could perform work in the national economy, the ALJ concluded that Whyte is not disabled. (Tr. 25.)

## STANDARD OF REVIEW

The court's role in reviewing an ALJ's decision is limited. It does not look at the evidence anew and make an independent determination as to whether the claimant is disabled. Rather, the court must affirm the ALJ's decision if it is supported by substantial evidence. *Moore*, 743 F.3d at 1120. Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id*. at 1120-21 (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). Thus, it is possible that opposing

conclusions both can be supported by substantial evidence. *Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004).

It is not the Court's role to reweigh evidence or substitute its judgment for that of the ALJ. *Moore*, 743 F.3d at 1121. Rather, the court must determine whether the ALJ complied with his obligation to build an "accurate and logical bridge" between the evidence and his conclusion that is sufficient to enable a court to review the administrative findings. *Beardsley v. Colvin*, 758 F.3d 834, 837 (7th Cir. 2014); *Thomas v. Colvin*, 745 F.3d 802, 806 (7th Cir. 2014). "This deference is lessened, however, where the ALJ's findings rest on an error of fact or logic." *Thomas*, 745 F.3d at 806. If the ALJ committed a material error of law, the court cannot affirm the ALJ's decision regardless of whether it is supported by substantial evidence. *Beardsley*, 758 F.3d at 837; *Farrell v. Astrue*, 692 F.3d 767, 770 (7th Cir. 2012).

## ANALYSIS

Whyte argues that the ALJ erred in (1) evaluating and assigning weight to the opinions of treating neurologist Dr. Bhupendra O. Khatri and treating physician Dr. Michelle Stueve, (2) assessing her subjective-symptom allegations, (3) determining that she would not be off task more than ten percent of the workday when changing positions at will, and (4) concluding that she was capable of other work.

## I. Treating physicians

"For claims filed before March 2017, a treating physician's opinion on the nature and severity of a medical condition is entitled to controlling weight if it is well-supported by medical findings and consistent with substantial evidence in the record." *Johnson v. Berryhill*, 745 F. App'x 247, 250 (7th Cir. 2018) (citing 20 C.F.R. § 404.1527(c)(2); *Brown v. Colvin*, 845 F.3d 247, 252 (7th Cir. 2016)). "If an ALJ does not give a treating physician's opinion controlling weight, the regulations require the ALJ to consider the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion" to determine how much weight to give the opinion. *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009) (citing 20 C.F.R. § 404.1527(c)(2)). "An ALJ must offer good reasons for discounting a treating physician's opinion." *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010) (internal quotations and citation omitted).

### A. Dr. Khatri

Dr. Khatri saw Whyte about every six months since at least January 2013. (Tr. 843-55, 858-60, 864-66, 932-37.) He diagnosed Whyte with relapsing-remitting MS (Tr. 844), which he noted is a non-curable, progressive disorder (Tr. 850). Her symptoms were "fatigue, chronic pain, and generalized weakness and visual changes." (Tr. 850.) In February 2016, Dr. Khatri wrote that Whyte was "overall doing well" but that she "continue[d] to have significant and disabling[] fatigue issues." (Tr. 860.)

The ALJ assigned little weight to Dr. Khatri's opinion despite finding that he was "a highly trained neurological specialist who personally observed and examined the claimant over multiple treatment visits." (Tr. 22.) According to the ALJ, Dr. Khatri's opinion "infringe[d] on a matter reserved for the Commissioner and fail[ed] to provide a function-by-function analysis." (Tr. 22.) The ALJ also determined that Dr. Khatri's opinion was incongruent with his own treatment notes and "inconsistent with the claimant's objective findings during consultative examination." (Tr. 22.)

Whyte argues that the ALJ failed to provide good reasons for discounting Dr. Khatri's opinion. (ECF No. 12 at 6-9.) She contends that the ALJ did not explain in what way Dr. Khatri's opinion was inconsistent with the fatigue she experienced as a symptom of her relapsing-remitting MS. (*Id.* at 7.) Nor did the ALJ point to any evidence that significantly contradicted Dr. Khatri's opinion. (*Id.* at 8.) Whyte also contends that statements on issues reserved for the Commissioner are not improper and that physicians are not required to provide a function-by-function analysis. (*Id.*)

The court agrees that the ALJ failed to properly evaluate Dr. Khatri's opinion. First, the ALJ suggested that doctors are prohibited from opining on issues reserved for the Commissioner, such as whether the claimant is disabled. The pertinent regulation relied upon by the ALJ simply states that a doctor's opinion that a claimant is disabled is not outcome determinative. *See* 20 C.F.R. § 1527(d)(1) ("A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are

disabled."). "That's not the same thing as saying that such a statement is improper and therefore to be ignored." *Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012). Thus, while the ALJ accurately characterized Dr. Khatri's opinion as a matter reserved for the Commissioner, he erred in discounting the opinion on that basis.

Second, the ALJ improperly identified Dr. Khatri's failure to provide a function-by-function analysis as a reason for discounting his opinion. ALJs, not doctors, are required to perform a function-by-function assessment of the claimant's work abilities. *See Colson v. Colvin*, 120 F. Supp. 3d 778, 792 (N.D. Ill. 2015) (citations omitted) ("[A]n an examining physician need not provide a function-by-function analysis."). Holding Dr. Khatri to such a requirement was particularly inappropriate in this case given that Whyte's symptoms (fatigue and pain) are not neatly translatable into specific functional limitations.

Finally, the medical records cited by the ALJ do not support his conclusion that Dr. Khatri's opinion was inconsistent with his own treatment notes and other evidence in the record. According to the ALJ, Dr. Khatri's treatment notes

> show the claimant's fatigue improving with Nuvigil and the claimant doing well overall, as she demonstrated full (5/5) strength in her upper and lower extremities, symmetrical deep tendon reflexes, the ability to walk on her heels, toes, and tandem walk, as well as negative Romberg testing at nearly every evaluation.

(Tr. 22) (citing Tr. 843-72, 930-78.) In fact, the records show that Whyte's medications provided only temporary relief—i.e., Nuvigil helped but did not eliminate her fatigue

issues. (Tr. 854-55, 857-58, 859.) Moreover, the mere fact that a condition is improving does not mean that it has improved to the point that the individual is able to engage in full-time employment. The ALJ failed to connect Whyte's temporary improvement while on medication with her ability to work full time. *See Tate v. Long Term Disability Plan*, 545 F.3d 555, 561 (7th Cir. 2008) ("Dr. Center's general conclusion that medication has provided 'significant benefit' to Tate does not prove anything unless the improvement is shown to be connected in some rational way to her ability to work.").

Likewise, Dr. Khatri's notes that Whyte was "doing well" and had normal physical exam findings during several appointments (Tr. 843-55, 858-60, 864-66, 932-37, 943-44, 952, 956, 964, 976) do not undermine his work-preclusive opinion. Whyte was diagnosed with non-curable, relapsing-remitting MS, meaning her symptoms were episodic and not likely to go away. Indeed, the consultative examiner noted that Whyte's symptoms would wax and wane. (Tr. 878.) Given the episodic nature of Whyte's symptoms, Dr. Khatri's description of how Whyte presented on the days of her appointments did not necessarily capture her ability to work on a sustained basis. *See Gerstner v. Berryhill*, 879 F.3d 257, 262 (7th Cir. 2018) ("Moreover, the affect and mood notes that the ALJ emphasized simply described how [the claimant] presented *on the days of her appointments*. They were not general assessments."). The gauntlet of physical tests Whyte endured during her appointments with Dr. Khatri (and during the consultative exam) do not

appear to test her main symptom, fatigue. And no medical source ever opined that these objective tests were inconsistent with Whyte's complaints.

Because of these errors, substantial evidence does not support the ALJ's decision to afford less than controlling weight to Dr. Khatri's opinion. On remand, the ALJ shall reevaluate the weight given to Dr. Khatri's opinion in light of the record evidence and the 20 C.F.R. § 404.1527(c) factors.

### B.     Dr. Stueve

On December 6, 2016, Whyte had her first and only appointment with Dr. Stueve. (Tr. 839-42.) Following the appointment, Dr. Stueve completed a "Physical Residual Capacity Questionnaire" in which she opined that Whyte exhibited the following symptoms: "blurry vision; off balance; falls; left arm uncoordination/weakness; general fatigue; back & neck pain." (Tr. 840.) Whyte's symptoms, in Dr. Stueve's view, would occasionally interfere with her attention and concentration. (Tr. 840.) According to Dr. Stueve, Whyte could sit, stand, and walk for about two hours each out of the workday; needed a job that permitted shifting positions at will from sitting, standing, or walking; and needed unscheduled breaks every two hours, each lasting for twenty minutes. (Tr. 840-41.) Dr. Stueve further opined that Whyte's impairments likely produced "good days" and "bad days," that Whyte would be absent from work about four days per month as a result of her impairments or treatment, and that Whyte's functioning was worse in cold conditions. (Tr. 842.)

The ALJ assigned little weight to Dr. Stueve's opinions. (Tr. 22.) He reasoned that Dr. Stueve had examined Whyte only one time and had failed to attach any treatment notes to her opinion, instead relying "on a check-the-box form." (Tr. 22.) The ALJ also determined that Dr. Stueve's opinions were inconsistent with the objective record and at times more limiting than what Whyte testified to. (Tr. 22) (citing Tr. 491, 498, 505, 512, 519.) According to the ALJ, Dr. Stueve's opinions "regarding unscheduled breaks, absences, and need to avoid cold [were] purely speculative, outside her area of expertise, [and] not congruent with the record showing the claimant doing well despite her MS and the claimant's documented activities of daily living." (Tr. 22.)

Whyte argues that the ALJ failed to provide good reasons for discounting Dr. Stueve's opinions. (ECF No. 12 at 9-11.) She contends that the ALJ impermissibly subjected Dr. Stueve's opinions to closer scrutiny than the opinions of the consultative examiner, Dr. Kurt L. Reintjes, who also examined Whyte only once. (*Id.* at 9.) Whyte also contends that the ALJ failed to consider the consistency between Dr. Stueve's opinions and Dr. Khatri's opinion and failed to explain in what way Dr. Stueve's opinions were inconsistent with objective findings. (*Id.* at 9-10.)

The ALJ's reasons for discounting Dr. Stueve's opinions were a mixed bag—some were legitimate, while others were not. For instance, the ALJ reasonably found that Dr. Stueve's opinions generally were not supported by treatment notes or an explanation, *see* 20 C.F.R. § 404.1527(c)(3), and that specific opinions concerning sitting, standing, and

concentrating were inconsistent with other evidence in the record, *see* 20 C.F.R. § 404.1527(c)(4). The ALJ also properly considered the minimal length of Dr. Stueve's treatment relationship with Whyte. *See* 20 C.F.R. § 404.1527(c)(2)(i). Whyte criticizes the ALJ for not similarly discounting the opinions of Dr. Reintjes, who also saw Whyte only one time. But Whyte does not identify which opinions of Dr. Reintjes she takes issue with or which the ALJ should have discounted as a result of the short treating relationship. In any event, the failure to similarly discount Dr. Reintjes's opinions as a result of the short treating relationship does not mean it was wrong to discount Dr. Stueve's opinions because of the short treating relationship.

Nevertheless, in assigning little weight to Dr. Stueve's opinion, the ALJ repeated the same questionable findings about Whyte's physical exams and reports of her "doing well" despite the MS. Standing alone, these dubious reasons likely would not warrant a remand. But given the problems identified above in weighing Dr. Khatri's opinion, and the consistency between the two treating doctors' opinions, *see Gerstner*, 879 F.3d at 262 (finding that the ALJ overlooked the extent to which the physician's opinions were consistent with the opinions of other medical sources who treated claimant), the court will instruct the ALJ on remand to reexamine the weight assigned to Dr. Stueve's opinions.

## II.     Whyte's subjective symptoms

An ALJ must engage in a two-step process to evaluate a claimant's symptoms.

First, the ALJ "must consider whether there is an underlying medically determinable

physical or mental impairment(s) that could reasonably be expected to produce an

individual's symptoms, such as pain." SSR 16-3p; *see also* 20 C.F.R. § 404.1529. "Second,

once an underlying physical or mental impairment(s) that could reasonably be expected

to produce the individual's symptoms is established, [the ALJ] evaluate[s] the intensity

and persistence of those symptoms to determine the extent to which the symptoms limit

an individual's ability to perform work-related activities." SSR 16-3p. "The

determination or decision must contain specific reasons for the weight given to the

individual's symptoms, be consistent with and supported by the evidence, and be

clearly articulated so the individual and any subsequent reviewer can assess how the

adjudicator evaluated the individual's symptoms." SSR 16-3p.

After describing Whyte's subjective allegations (Tr. 19), the ALJ began his

evaluation with the following boilerplate paragraph:

> After careful consideration of the evidence, the undersigned finds that the
> claimant's medically determinable impairments could reasonably be
> expected to produce some of the symptoms of the types alleged.
> However, the claimant's statements concerning the intensity, persistence
> and limiting effects of these symptoms are not entirely consistent with the
> medical evidence and other evidence in the record for the reasons
> explained in this decision.  Accordingly, these statements have been found
> to affect the claimant's ability to work only to the extent they can
> reasonably be accepted as consistent with the objective medical and other
> evidence.

(Tr. 20.) The ALJ then developed his evaluation of Whyte's symptoms over the course of the next several paragraphs. (*Id.* at 20-23.) First, he summarized the objective medical evidence, finding that "[t]he record fail[ed] to fully substantiate the claimant's allegations of disabling symptoms." (*Id.* at 20-21.) Second, he listed Whyte's reported activities—working part time, volunteering at 4H and her daughter's school, driving, performing household chores, managing her own money, traveling, assisting with her daughter's wedding planning, being very involved with her daughter's activities, gardening, scrapbooking, sewing, and enjoying the outdoors—and concluded that Whyte was "more capable than her allegations of disabling symptoms assert." (Tr. 21) (citing Tr. 372, 415, 421, 435, 438, 445, 448, 468, and hearing testimony.)

Whyte argues that the ALJ failed to assess her subjective allegations in accord with SSR 16-3p. (ECF No. 12 at 17-20.) She contends that the ALJ used improper and inconsistent standards to evaluate her allegations, failed to explain how the objective medical evidence and reported activities were inconsistent with her allegations, and did not fully consider her vision problems. The court largely agrees.

The ALJ used inconsistent standards for evaluating Whyte's subjective symptoms, finding that they were "not entirely consistent with the medical evidence and other evidence in the record," credited "only to the extent they can reasonably be accepted as consistent with the objective medical and other evidence," and not "fully substantiate[d]" by the record. (Tr. 20.) The second phrase is an accurate recitation of

the standard required by social security the regulations; the other two are not. *See* 20 C.F.R. § 404.1529(a) ("In determining whether you are disabled, we consider all your symptoms, including pain, and the extent to which your symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence.").

Moreover, the two incorrect standards appear to be more rigorous than the one the ALJ should have used. *See, e.g.*, *Minger v. Berryhill*, 307 F. Supp. 3d 865, 871-72 (N.D. Ill. 2018) (remanding where ALJ used same "not entirely consistent" standard applied here). Because it is impossible for this court to determine which of the three standards the ALJ actually applied—and whether that standard was correct—the ALJ has failed to build an accurate and logical bridge between the evidence and his subjective-symptom evaluation.

The ALJ also failed to explain how Whyte's complaints of extreme fatigue were inconsistent with the relatively "normal" objective medical findings. As noted above, Whyte's symptoms were episodic and tended to flare up with extended activity. Thus, the fact that she appeared to be "doing well" during a given appointment or showed few signs upon physical examination was not reflective of her ability to perform sustained work.

Similarly, the ALJ overstated the extent of Whyte's daily activities. Whyte worked only three to three-and-a-half hours per day and was allowed nearly unlimited breaks by her boss ("no sleeping on the job as he puts it"), a close friend. (Tr. 100-01.)

This accommodating situation likely could not be replicated in the workforce. Moreover, even this minimal employment caused Whyte extreme fatigue. (Tr. 101.) Whyte also reported that she tired doing laundry, needed to rest after ascending one flight of stairs, drove short distances to work and the grocery store, cooked only simple meals, became exhausted and in pain after cleaning three rooms, and took breaks while crafting. (Tr. 95, 102-05, 374.) The ALJ failed to explain how Whyte's ability to engage in these limited activities, at her own pace, was inconsistent with her complaints of disabling pain and fatigue. *See Craft v. Astrue*, 539 F.3d 668, 680 (7th Cir. 2008) (remanding where ALJ ignored the claimant's qualifications as to how he carried out his reported activities, noting that "[e]ach activity left him exhausted").

The ALJ, however, did not err in assessing Whyte's alleged vision problems. Whyte testified at the supplemental hearing that she suffered from blurry vision in both eyes for a couple hours each day, during which she was unable to read. (Tr. 44-45.) Just three months prior, the ALJ noted, Whyte had told the consultative examiner that she experienced flare ups with her optic neuritis about once a year. (Tr. 888.) Indeed, the record reveals only two such flare-ups, in August 2012 and January 2014—prior to Whyte's amended alleged onset date. (Tr. 371, 390, 406.) And Whyte frequently reported to treatment providers that her vision was fine. (*See* Tr. 380, 854, 856, 898.) The ALJ therefore reasonably determined that the severity of vision loss claimed by Whyte

at the hearing was not consistent with the objective medical evidence in the record. (Tr. 16.)

Overall, the ALJ's evaluation of Whyte's subjective symptoms lacks explanation and support in the record. The ALJ on remand shall reevaluate these allegations in accordance with SSR 16-3p. *See Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001) (remanding where ALJ failed to explain "the 'inconsistencies' between [the claimant's] activities of daily living . . . , his complaints of pain, and the medical evidence").

## III.     Off-task limitation

Between steps three and four of the sequential evaluation process the ALJ must determine the claimant's RFC—that is, the most she can do despite her physical and mental limitations. 20 C.F.R. § 404.1545(a)(1); *see also* SSR 96-8p. ALJs must assess a claimant's RFC "based on all of the relevant evidence in the case record, including information about the individual's symptoms and any 'medical source statements.'" SSR No. 96-8p. "The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." SSR No. 96-8p. "The [ALJ] must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." SSR 96-8p.

The ALJ here found that Whyte needed to "be allowed to alternate between sitting and standing at will as long as she [was] not off task for greater than ten percent of the workday." (Tr. 18.) Whyte argues that the ALJ failed to explain how he arrived at the ten percent figure. (ECF No. 12 at 11-12.) She suggests that the ALJ chose ten percent, rather than five or fifteen percent or some other number, because the VE testified that no employer would tolerate a worker to be off task for more than ten percent of the workday. The Commissioner argues that an off-task limitation is not "susceptible to [] mathematical precision" and that the ALJ here thoroughly considered the record in determining that Whyte would be off-task no more than ten percent of the workday. (ECF No. 17 at 13-14) (quoting *Priessnitz v. Berryhill*, Case No. 17-C-372, 2018 U.S. Dist. LEXIS 33095, at *28 (E.D. Wis. Mar. 1, 2018)). The Commissioner further argues that Whyte has failed to show how she was harmed by the ALJ's off-task limitation.

The ALJ failed to build an accurate and logical bridge between the evidence and his conclusion that Whyte would be off task no more than ten percent of the workday when allowed to alternate positions at will. Whyte testified that she could walk for half a block, stand for thirty minutes, and sit for about an hour before her pain started to bother her. (Tr. 96-97.) The ALJ appears to have partially credited this testimony, as he stated that the sit-stand option was "to account for [Whyte's] reported reduced sitting, standing, and walking tolerances." (Tr. 19.) But the ALJ never explained how this

testimony translated into the specific ten percent off-task finding. *See Lanigan v. Berryhill*, 865 F.3d 558, 563-64 (7th Cir. 2017) (remanding where ALJ failed to explain basis for ten percent off-task limitation).

The record shows that Whyte was potentially harmed by the ALJ's error. Whyte testified that it took her all day to do three loads of laundry because she needed to lie down and rest for fifteen to twenty minutes each time she goes up and down the stairs. (Tr. 95.) Whyte also testified that her boss allowed her to take breaks—getting up and stretching, walking around—at her part-time job, which she did for only three to three-and-a-half hours each day. (Tr. 100-01.) According to Whyte, the part-time work was so exhausting that, immediately upon arriving home, she lay on the couch to rest for about twenty minutes. (Tr. 101.) Based on this testimony, it seems likely that Whyte would be off task more than ten percent of a typical workday. And the VE testified that a person with Whyte's age, education, and work experience could not sustain full-time employment if she were off task more than ten percent of the workday. (Tr. 65-66.)

On remand, the ALJ shall reevaluate Whyte's ability to remain on task according to SSR 96-8p—specifically, whether Whyte would be off-task for more than ten percent of the workday while changing positions at will.

## IV.     Step-five finding

At step five, the Commissioner has "the burden of demonstrating the existence of significant numbers of jobs in the national economy that [the claimant] could perform."

*Chavez v. Berryhill*, 895 F.3d 962, 964 (7th Cir. 2018); *see also* 20 C.F.R. § 404.1560(c)(2). "In the context of job-number estimates, . . . the substantial evidence standard requires the ALJ to ensure that the approximation is the product of a reliable method." *Chavez*, 895 F.3d at 968 (citations omitted). "[A]ny method that the agency uses to estimate job numbers must be supported with evidence sufficient to provide some modicum of confidence in its reliability." *Id.* at 969.

The ALJ determined that, considering her age, education, work experience, and RFC, Whyte could perform a significant number of jobs in the national economy. (Tr. 23.) In doing so, he overruled Whyte's objections to the VE's qualifications and relied on the VE's testimony that Whyte could work as an electrical accessories assembler or a bagger. (Tr. 24-25.)

Whyte argues that the ALJ's step-five finding does not comport with social security regulations and rulings. (ECF No. 12 at 12-17.) First, she contends that the ALJ failed to comply with SSR 83-12 in determining whether his RFC finding caused a slight or significant reduction in the light occupational base. (*Id.* at 12-15.) Whyte maintains that the limitations imposed by the ALJ significantly eroded the light work occupational base. This matters, according to Whyte, because she would have been disabled per the Medical-Vocational Guidelines (i.e., "the grids") at age fifty if limited to sedentary work. Second, she contends that the ALJ erred in relying on the VE's testimony regarding how the RFC assessment would erode the number of electrical accessories assembler positions

available. (*Id.* at 15-17.) The VE was unqualified, in Whyte's view, and failed to explain the bases for his job-number estimates.

Whyte's first argument is unpersuasive. "[T]he regulations broadly specify that the grids are to be employed and a conclusion directed regarding disability when a claimant's 'vocational factors and [RFC] coincide with *all of the criteria* of a particular rule[.]'" *Haynes v. Barnhart*, 416 F.3d 621, 627 (7th Cir. 2005) (quoting 20 C.F.R. Pt. 404, Subpt. P, App. 2 § 200.00(a)). "But when a claimant does not precisely match the criteria set forth in the grids, the grids are not mandated." *Haynes*, 416 F.3d at 628 (citing SSR 83-10). That is the situation presented here. "[Whyte's] RFC falls somewhere between the light and sedentary exertional levels, and thus [she] does not match all of the criteria of the rules set forth in the grids." *Haynes*, 416 F.3d at 628. Consequently, the ALJ appropriately used the grids as only a framework and consulted with a VE to determine whether the light occupational base was significantly eroded. *See id.* at 628 (citing SSR 83-12).

Nevertheless, the VE's job estimates were unreliable. The hypothetical person posed to the VE was limited to frequent reaching, overhead reaching, handling, fingering, and feeling with her (non-dominant) right upper extremity and occasional reaching, overhead reaching, handling, fingering, and feeling with her (dominant) left upper extremity. (Tr. 58-59.) The VE testified that the *Dictionary of Occupational Titles* does not address individual appendages, so his job estimates with respect to the reaching

limitations would "be based on [his] knowledge of the examples [he] gives." (Tr. 60.) According to the VE, there were about 21,800 electrical accessories assembler positions available in the U.S., and fifty percent of those positions would be available to a person with the arm limitations outlined above. (Tr. 60.) When asked how he calculated the level of erosion, the VE responded, "I basically made an educated guess as a vocational expert. That was how I arrived at that number." (Tr. 72-73.) The VE did not explain whether the bagger job numbers he provided (about 70,000 available positions) would be eroded by such arm limitations. (Tr. 60-61.)

The VE failed to provide a reasoned and principled explanation for his job-number estimates. *See Chavez*, 895 F.3d at 970. Although a VE may in certain cases rely on his experience to support his testimony, the VE here did sufficiently explain how that experience informed his testimony. His statement that the estimates would be based on his knowledge of the examples he provided is circular and not particularly helpful. Likewise, the VE failed to justify why his experience made his "educated guess" reliable. The VE, in fact, did not appear to be particularly confident in his estimates, stating that he's "probably closer than just an average person who doesn't do vocational counseling for a living." (Tr. 67.)

Without the VE's unreliable job-estimate testimony, the ALJ had no basis for his step-five finding. *See Chavez*, 895 F.3d at 964 (noting that the Commissioner has the burden at step five "of demonstrating the existence of significant numbers of jobs in the

national economy that [the claimant] could perform"). The ALJ shall address this error on remand.

**IT IS THEREFORE ORDERED** that the Commissioner's decision is **reversed**, and this matter is **remanded** for further proceedings consistent with this decision. The clerk of court shall enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 25th day of October, 2019.

WILLIAM E. DUFFIN
U.S. Magistrate Judge